UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RED BULL NORTH AMERICA, INC. and
RED BULL GMBH LIMITED LIABILITY
COMPANY,

       Plaintiffs,

vs.

SOHO EAST AVENUE INC.; 289 ALEXANDER
STREET INC; DAVIS COWDEN INC; 336
DUKES INC., RDCUSE INC., and RONALD A.
DAVIS,

       Defendants.

---

**COMPLAINT AND JURY DEMAND**

Civil Action No.

Plaintiffs Red Bull North America, Inc. ("Red Bull NA") and Red Bull GmbH Limited Liability Company ("Red Bull GmbH") complain against Defendants Soho East Avenue, Inc., 289 Alexander Street Inc., Davis Cowden Inc., 336 Dukes Inc., Rdcuse Inc., and Ronald A. Davis as follows:

## NATURE OF THE CASE

This is a civil action for unfair competition, trademark infringement, and unjust enrichment arising under the Lanham Act, 15 U.S.C. §§ 1114, 1116, 1125(a) and New York common law, seeking preliminary and permanent injunctive relief, monetary damages and related remedies.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338 and 1367 and 15 U.S.C. § 1121.

2. Personal jurisdiction and venue are proper in this federal judicial district pursuant to 28 U.S.C. § 1391(b) and (c) because all Defendants reside in New York and one or more Defendants

HARRIS BEACH
ATTORNEYS AT LAW

reside in the Western District of New York, and because a substantial part of the acts or omissions giving rise to the lawsuit occurred in the Western District of New York.

## PARTIES

3.   Plaintiff Red Bull GmbH is a limited liability company duly organized under the laws of Austria with its principal place of business at Am Brunnen 1, Fuschl am See, 5330 Austria.

4.   Plaintiff Red Bull NA is a corporation duly organized and existing under the laws of the State of California with its principal place of business in Santa Monica, California.  Plaintiff Red Bull NA is a wholly owned subsidiary of Plaintiff Red Bull GmbH.

5.   Upon information and belief, Defendant 336 Dukes Inc. is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.  Upon information and belief, Defendant 336 Dukes Inc. owns and operates Daisy Dukes, a bar located at 336 East Avenue in Rochester, New York.

6.   Upon information and belief, Defendant 289 Alexander Street Inc. is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.  Upon information and belief, Defendant 289 Alexander Street Inc. owns and operates Coyote Joe's, a bar located at 384 East Avenue in Rochester, New York.

7.   Upon information and belief, Defendant Davis Cowden Inc. is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.  Upon information and belief, Defendant Davis Cowden Inc. formerly owned and operated the Alexander Street Pub, a bar located at 291 Alexander Street in Rochester, New York.

8.   Upon information and belief, Defendant Soho East Avenue Inc. is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.  Upon information and belief, Defendant Soho East Avenue, Inc. owns

and operates Soho East, a bar located at 336B East Avenue in Rochester, New York.

9.   Upon information and belief, Defendant Rdcuse Inc. is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.  Upon information and belief, Defendant Rdcuse Inc. owns and operates Daisy Dukes and Soho Lounge, two bars located at 414 South Clinton Street in Syracuse, New York.

10. Upon information and belief, Defendant Ronald A. Davis is a citizen of the state of New York and a principal of Defendant Soho East Avenue, Inc., Defendant Davis Cowden Inc., Defendant 289 Alexander Street Inc., and Defendant Rdcuse Inc.  Upon information and belief, Mr. Davis manages and operates Coyote Joe's, Soho East (in both Rochester and Syracuse), and Daisy Dukes (in both Rochester and Syracuse).  Upon information and belief, Mr. Davis managed and operated Alexander Street Pub.  Upon information and belief, Mr. Davis owns, manages, and operates APub Live, a bar located at 336 East Avenue in Rochester, NY.  Upon information and belief, Ronald Davis engaged in the unlawful activities alleged below and/or permitted others to engage in such unlawful activities as agents for him, Soho East Avenue, Inc., Davis Cowden Inc., 289 Alexander Street Inc., 336 Dukes Inc., and/or Rdcuse Inc.

## ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

11. Plaintiff Red Bull GmbH is a worldwide manufacturer and distributor of a non-alcoholic beverage known as RED BULL® (hereafter "RED BULL®" or "RED BULL® energy drink").  RED BULL® is a non-alcoholic, yellowish in color beverage that contains the amino acid taurine, glucuronolactone, B-complex vitamins, caffeine and carbohydrates.  RED BULL® is marketed and sold primarily as an energy drink.  RED BULL® is commonly found in restaurants and bars.  Patrons of these establishments generally purchase, order and consume RED BULL® alone or together with alcoholic beverages.  Until October 2006, RED BULL® was distributed solely in 8.3 ounce

aluminum cans.  Since October 2006, RED BULL® has been distributed solely in 8.3 ounce aluminum cans and 12.0 ounce slimline aluminum cans.

12. Plaintiff Red Bull GmbH owns United States Trademark Registration No. 3,092,197 for the mark RED BULL® in connection with non-alcoholic beverages including energy drinks, among many other things.  A true and correct copy of the trademark registration is attached as Exhibit A.

13. Plaintiff Red Bull GmbH's marks are well known, distinctive, famous and serve as identifiers of its energy drink to consumers, based upon Plaintiff Red Bull GmbH's many years of continuous, widespread use and extensive advertising and promotion under the marks.  In addition to its extensive worldwide advertising and marketing, Plaintiff Red Bull GmbH and its authorized U.S. distributors have spent nearly $1,000,000,000.00 since 1996 advertising and promoting the RED BULL® mark and the RED BULL® energy drink in the United States alone.  Approximately 1 billion cans of RED BULL® were sold in 2005 in the United States.

14. In 1997, Plaintiff Red Bull GmbH granted Plaintiff Red Bull NA the exclusive right to distribute and sell the RED BULL® energy drink in the United States and permitted Red Bull NA to grant third parties the right to distribute RED BULL® within the United States.  Currently, Red Bull NA has approximately 275 United States RED BULL® distributors.

15. Plaintiffs Red Bull GmbH, Red Bull NA and the RED BULL® mark are in no way affiliated or in any way associated with the manufacturers of a beverage called Mad Croc.  RED BULL® is not and never has been distributed in beverage guns.

### Red Bull NA Warns Defendants Against Passing Off

16. On April 7, 2005, Red Bull NA On-Premise Manager Leonard Martinez and former Diamond Beverages employee Dave Dicataldo met with Ronald Davis and reminded Mr. Davis that

passing off other products as RED BULL® was illegal.  Mr. Davis told them that no one knew the difference between a competitor product and RED BULL®.  Mr. Davis was defiant, acknowledging that he had received a letter from "Red Bull" but stating that he would not get in trouble because he had not advertised RED BULL®.  Mr. Davis stated, "If a customer asks for a Coke, you give them a drink.  You never tell them we don't have Coke. You just give them a drink."

### Defendants Pass Off Despite Warnings

17. Mr. Martinez and Mr. Dicataldo entered Daisy Dukes in Rochester on April 22, 2005 and ordered two "RED BULL® and Jagermeister" cocktails from a bartender.  When Mr. Martinez observed the bartender preparing the drinks using two cans of Mad Croc, Mr. Martinez asked her what she was doing because he had ordered RED BULL®.  She responded, "this is the generic RED BULL®." Mr. Martinez told her that when customers order RED BULL® cocktails, she must inform them that Daisy Dukes does not carry RED BULL®.  The bartender apologized and told Mr. Martinez that she was told to use Mad Croc.

18. Later on April 22, 2005, Mr. Martinez and Mr. Dicataldo entered the Alexander Street Pub and ordered four "RED BULL® and Jagermeister" cocktails from a bartender.  In response to their order, the bartender placed two cans of Mad Croc on the counter.  Mr. Martinez asked her what she was making, and the bartender responded, "RED BULL® and Jagermeister.  That's what you asked for." Mr. Martinez queried, "Where is the RED BULL®?" and the bartender replied that Mad Croc was the same thing as RED BULL®.  Mr. Martinez responded that Mad Croc and RED BULL® were not the same.  Mr. Martinez was not verbally informed of the substitution until he confronted the bartender about the substitution as she was preparing the drink.  Mr. Martinez and Mr. Dicataldo also observed a RED BULL® mat on display at Soho East on April 22, 2005.

19. Red Bull NA employee Alexander Dunstan entered Soho East in Rochester on May 7, 2005, and ordered two "RED BULL® and vodka" cocktails from a bartender. The bartender prepared the drinks behind the bar and out of sight, and served the drinks without informing Mr. Dunstan of any substitution. After the bartender served the drinks, he responded to a question posed by another bar patron by telling Mr. Dunstan that the drinks were the "same stuff" as RED BULL®.

20. Later on May 7, 2005, Mr. Dunstan entered Daisy Dukes in Rochester and ordered two "RED BULL® and vodkas" from a bartender. Mr. Dunstan observed the bartender prepare the drinks using two cans of Mad Croc beverage but was not verbally informed of the substitution before the drinks were prepared. After the bartender prepared the drinks, he responded to a question posed by another bar patron by telling Mr. Dunstan that the beverage used was "the same" thing as RED BULL®.

21. Later on May 7, 2005, Mr. Dunstan entered Coyote Joe's and ordered two "RED BULL® and vodka" cocktails from a female bartender. The bartender prepared the drinks behind the bar and out of sight. After the bartender served the drinks, she responded to a question posed by another customer by telling Mr. Dunstan that Mr. Dunstan's drinks contained "the same thing" as RED BULL®. The bartender explained that Coyote Joe's used the other product because it was "cheaper."

### Red Bull NA Again Warns Defendants Against Passing Off

22. On May 10, 2005, Mr. Martinez sent Mr. Davis a letter recounting several instances of passing off observed on April 22, 2005 and May 7, 2005 at his Rochester bars: Daisy Dukes, Alexander Street Pub, Soho, and Coyote Joe's. The letter reminded Mr. Davis that passing off other products as RED BULL® was illegal, and that customers ordering RED BULL® must be informed what brand they are being served.

23. On May 20, 2005, Mr. Davis told Mr. Dicataldo that he had received the letter.  Mr. Davis told Mr. Dicataldo that any persons from "Red Bull" would be arrested for trespassing if they were on any of his properties.

### Passing Off Continues in July 2005 Despite Multiple Warnings

24. On July 7, 2005, private investigator Adam George entered Daisy Dukes in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender.  Mr. George observed the bartender prepare the drink using a can of Mad Croc.  The bartender served the drink without informing Mr. George of the substitution.  Mr. George asked if the drink contained RED BULL®, and the bartender replied that it was made with a substitute called Mad Croc.

25.  Later on July 7, 2005, Mr. George entered Soho East in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender.  Mr. George observed the bartender prepare the drink using a can of Mad Croc.  The bartender served the drink without informing Mr. George of the substitution.  Mr. George asked if the drink contained RED BULL®, and the bartender replied that the drink contained Mad Croc, a RED BULL® substitute.

26. While still inside Soho East, Mr. George ordered a second "vodka and RED BULL®" cocktail from a second bartender.  Mr. George observed the second bartender prepare the drink using a can of Mad Croc.  The second bartender also served the drink without informing Mr. George of the substitution.  Mr. George again asked if the drink contained RED BULL®, and the second bartender again replied that the drink contained Mad Croc, a RED BULL® substitute.

27. Later on July 7, 2005, Mr. George entered Coyote Joe's and ordered a "Vodka and RED BULL®" cocktail from a bartender.  Mr. George observed the bartender prepare the drink with a can of Mad Croc but was never verbally informed of the substitution.

28. On July 8, 2005, Mr. George entered the Alexander Street Pub and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink using a can of Mad Croc. The bartender served the drink without first informing Mr. George of the substitution.

29. On July 29, 2005, Mr. George returned to Soho East in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink using a can of Mad Croc. The bartender served the drink without verbally informing Mr. George of the substitution. When Mr. George then asked the bartender whether the drink contained RED BULL®, the bartender replied that Soho East used a substitute called Mad Croc.

30. Later on July 29, 2005, Mr. George returned to Daisy Dukes in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink using a can of Mad Croc. The bartender served the drink without informing Mr. George of the substitution. Mr. George then asked if the drink contained RED BULL®, and the bartender replied that it was made with a substitute called Mad Croc.

31. Later on July 29, 2005, Mr. George returned to the Alexander Street Pub and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink using a can of Mad Croc. The bartender served the drink without first informing Mr. George of the substitution.

32. Later on July 29, 2005, Mr. George returned to Coyote Joe's and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink with a can of Mad Croc. The bartender served the drink without first informing Mr. George of any substitution.

## Passing Off Continues Through the End of 2005 Despite Multiple Warnings

33. On August 11, 2005, Red Bull NA team member Katherine Cunningham entered the Alexander Street Pub and ordered three "RED BULL® and Skyy Vodka" cocktails from a bartender. Although the bartender's hand partially concealed the label, Ms. Cunningham observed the bartender prepare the drink with a can of Mad Croc. After tasting the cocktail, Ms. Cunningham asked the bartender if she had served RED BULL®. The bartender said that it was Mad Croc, not RED BULL®, and showed Ms. Cunningham a can of Mad Croc. Ms. Cunningham was not verbally informed of the substitution until after she had been served the drink and she specifically asked if it was RED BULL®.

34. On August 19, 2005, Ms. Cunningham and Red Bull NA On Premise Manager Leonard Martinez entered Daisy Dukes in Rochester and approached a bartender. Mr. Martinez asked the bartender whether Daisy Dukes sold Smirnoff or Stoli Vodka because he did not like ordering one drink and receiving something else. The bartender told him that they sold Smirnoff Raspberry. Mr. Martinez ordered two "Smirnoff Raspberry and RED BULL®" cocktails. Mr. Martinez and Ms. Cunningham observed the bartender prepare the drinks with cans of Mad Croc but was not verbally informed of the substitution. After the bartender served the drinks, Mr. Martinez asked if the drinks contained RED BULL®, and the bartender replied that they did. Mr. Martinez then asked for the leftover can of RED BULL® and the bartender handed him a can of Mad Croc. When Mr. Martinez complained that the can wasn't RED BULL®, the bartender responded that it was the same thing.

35. Later on August 19, 2005, Ms. Cunningham and Mr. Martinez entered Soho East in Rochester and ordered two "RED BULL® and Smirnoff Raspberry" cocktails from a bartender. Mr. Martinez observed the bartender prepare the drinks using cans of Mad Croc. The bartender served the drinks without informing either Mr. Martinez or Ms. Cunningham of any substitution. After the

bartender served the drinks, Mr. Martinez asked for the leftover cans of RED BULL®, and the bartender handed him two cans of Mad Croc. When Mr. Martinez complained that he had ordered RED BULL®, the bartender replied that Mad Croc was the same thing.

36. Later on August 19, 2005, Mr. Martinez and Ms. Cunningham entered Coyote Joe's and asked a Coyote Joe's bouncer or manager whether Coyote Joe's carried RED BULL®. The bouncer or manager responded that Coyote Joe's did, so Mr. Martinez ordered two "Smirnoff Raspberry and RED BULL®" cocktails and one "can of RED BULL®" from a bartender. Mr. Martinez observed the bartender prepare the drinks using two cans of Mad Croc. The bartender served the drinks without verbally informing either Mr. Martinez or Ms. Cunningham of any substitution. Mr. Martinez reminded the bartender that he wanted RED BULL®, and the bouncer or manager responded that Mad Croc was the same thing and that the bar carried Mad Croc because it was less expensive.

37. On December 17, 2005, private investigator Adam George entered the Alexander Street Pub and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink using a can of Mad Croc. The bartender served the drink and Mr. George obtained the can of Mad Croc she used to prepare the drink. In a later conversation with the bartender, Mr. George learned that the bar used Mad Croc as a substitute for RED BULL®.

38. Later on December 17, 2005, Mr. George entered Daisy Dukes in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink with a can of Mad Croc. The bartender served the drink without first informing Mr. George of the substitution. On December 17, 2005, Mr. George also investigated Coyote Joe's, where he ordered a "vodka and RED BULL®" cocktail from a bartender and observed the bartender prepare the drink with a can of Mad Croc. The Coyote Joe's bartender served the drink without first verbally informing Mr. Geore of the substitution.

39. Later on December 17, 2005, Mr. George entered Soho East in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. George observed the bartender prepare the drink using a can of Mad Croc. The bartender served the drink without first informing Mr. George of the substitution.

### Red Bull NA Again Warns Defendants Against Passing Off

40. On March 27, 2006, James Goniea, outside counsel for Red Bull NA, sent a letter to Mr. Davis reminding him that the practice of passing off non-RED BULL® beverages to customers who order RED BULL® by name is illegal. The letter informed Mr. Davis that Red Bull NA had evidence of numerous instances of passing off by his employees. The letter reminded Mr. Davis that when customers order a RED BULL® by name, bartenders must either serve the customers RED BULL® or inform the customers that RED BULL® is not available. The letter reminded Mr. Davis that if his bars offered a substitute product to customers requesting RED BULL®, the customers must be informed of, and approve, the substitution before the bartenders can serve them a substitute product. The letter explained that Red Bull NA would pursue legal remedies unless Mr. Davis stopped any further instances of passing off at his bars.

### Passing Off Continues Despite Repeated Warnings

41. On April 21, 2006, private investigator Jeremy White entered the Alexander Street Pub and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. White observed the bartender prepare the drink using a can of Mad Croc. The bartender never verbally informed Mr. White of the substitution.

42. After several minutes, Mr. White asked a different Alexander Street Pub bartender to top off his drink with more "RED BULL®". Mr. White observed the second bartender use a can of Mad Croc to top off the drink. The second bartender never verbally informed Mr. White of the

substitution.

43. While still inside the Alexander Street Pub, Mr. White ordered another "vodka and RED BULL®" cocktail from a third bartender. Mr. White observed this third bartender prepare the drink using a can of Mad Croc. The third bartender never verbally informed Mr. White of the substitution.

44. Later on April 21, 2006, Mr. White entered Daisy Dukes in Rochester and ordered a "Vodka and RED BULL®" cocktail from a bartender. Mr. White observed the bartender prepare the drink using a can of Mad Croc but was never verbally informed of the substitution.

45. Later on April 21, 2006, Mr. White entered Soho East in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. White observed the bartender prepare the drink using a can of Mad Croc but was never verbally informed of the substitution.

46. On April 22, 2006, Mr. White returned to Daisy Dukes in Rochester and ordered a "vodka and RED BULL®" cocktail from a bartender. Mr. White observed the bartender prepare the drink using a can of Mad Croc but was never verbally informed of the substitution.

47. Mr. White also entered Coyote Joe's on April 22, 2006, and asked a bartender whether Coyote Joe's carried RED BULL®. The bartender replied, "Yeah, we have it." Mr. White then ordered a "Vodka and RED BULL®". Mr. White observed the bartender prepare the drink using a can of Mad Croc but was never verbally informed of the substitution.

48. On May 27, 2006, Mr. White entered Daisy Dukes in Syracuse and ordered a "vodka and RED BULL®" from a bartender. Mr. White observed the bartender prepare the drink using a can of Mad Croc which had previously been sitting out of view behind the bar. Mr. White was never informed of any substitution of non RED BULL® energy drink for a RED BULL®.

49. Later, on May 27, 2006, Mr. White entered Soho Lounge in Syracuse and ordered three "vodka and RED BULL®s" from a bartender. Mr. White observed the bartender prepare the drinks

using a can of Mad Croc which had previously been sitting out of view behind the bar. Mr. White was never informed of any substitution of any non RED BULL® energy drink for RED BULL®.

50. On September 28, 2006, Mr. White returned to Daisy Dukes in Rochester and ordered a "Vodka and RED BULL®" from a bartender. Mr. White observed the bartender prepare his drink using a beverage poured from a beverage gun instead of a can of RED BULL®. Mr. White was never verbally informed of any substitution of non-RED BULL® energy drink for RED BULL®.

51. On September 29, 2006, Mr. White returned to Coyote Joe's and ordered a "Vodka and RED BULL®" from a bartender. Mr. White observed the bartender prepare his drink using a beverage poured from a beverage gun instead of a can of RED BULL®. Mr. White was never verbally informed of any substitution of non-RED BULL® energy drink for RED BULL®.

52. Later on September 29, 2006, Mr. White went to the Soho Lounge in Rochester and ordered a "Vodka and RED BULL®" from a bartender. Mr. White observed the bartender prepare his drink using a beverage poured from a beverage gun instead of a can of RED BULL®. Mr. White was never verbally informed of any substitution of non-RED BULL® energy drink for RED BULL®.

53. Also on September 29, 2006, Mr. White went to 291 Alexander Street in Rochester, where Alexander Street Pub had previously been located. Mr. White learned that the Alexander Street Pub, as it was formerly known at its Alexander Street location, had closed down and relocated to 336C East Avenue in Rochester where it was operating under a new name. Mr. White walked to this new location, in the same building as Daisy Dukes and the Soho Lounge, and saw a banner on the wall that identified this new bar as "A-Street Pub." Mr. White ordered a "Vodka and RED BULL®" from a bartender, and observed the bartender prepare his drink using a beverage poured from a beverage gun instead of a can of RED BULL®. Mr. White was never verbally informed of any substitution of non-RED BULL® energy drink for RED BULL®. Subsequent to this

investigation, Mr. White viewed the website, http://www.iamthirsty.com/APUBLive/, and noted that this bar is advertised as "APub Live."

54. On October 14, 2006, private investigator Roger Young entered Daisy Dukes in Syracuse and ordered a "Vodka and RED BULL®" cocktail. Mr. Young observed the bartender prepare the drink using a beverage poured from a beverage gun dispenser, instead of a can of RED BULL®. The bartender served Mr. Young the drink without informing him of any substitution of a non RED BULL® beverage for RED BULL®. Mr. Young asked a second Daisy Dukes bartender about the contents of the beverage gun dispenser that the other bartender had used to prepare his first drink. This second bartender told him that the beverage gun dispenser contained RED BULL®.

55. Mr. Young ordered another "Vodka and RED BULL®" from another Daisy Dukes bartender. Again, Mr. Young observed the bartender prepare the drink using a beverage poured from a beverage gun dispenser, instead of a can of RED BULL®. Again, the bartender served Mr. Young the drink without informing him of any substitution of a non RED BULL® beverage for RED BULL®. Mr Young asked a fourth Daisy Dukes bartender about the contents of the beverage gun dispenser that the bartender had used to prepare his second drink. This fourth bartender told Mr. Young that the beverage gun dispenser contained RED BULL®.

56. Later on October 14, 2006, Mr. Young went to Soho East in Syracuse and ordered a "Vodka and RED BULL®". Just like at Daisy Dukes, Mr. Young observed the bartender prepare the drink using a beverage poured from a beverage gun dispenser, instead of a can of RED BULL®. The bartender served Mr. Young the drink without informing him of any substitution of a non RED BULL® beverage for RED BULL®.

## COUNT I

### Unfair Competition in Violation of Section 43(a)
### of the Lanham Act, 15 U.S.C. §1125(a)

57. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 of the Complaint.

58. Defendants have deliberately misled the public and the trade into believing that beverages sold by Defendants are sponsored, authorized or approved by, or in some other way associated with, Plaintiffs Red Bull NA and Red Bull GmbH, through their substitution, without comment, of another beverage for RED BULL® when RED BULL® is specifically ordered by the customer.

59. Defendants' imitating and infringing use of the RED BULL® mark by passing off non-RED BULL® beverages as RED BULL® constitutes unfair competition, false designation of origin and false representations, in violation of the Lanham Act, 15 U.S.C. § 1125(a).

60. Defendants' sale of non-RED BULL® beverages as RED BULL® has created and continues to create a likelihood of confusion, mistake or deception as to the affiliation, connection, association, origin, sponsorship, nature, characteristics and qualities of the drinks served by Defendants relative to the RED BULL® energy drink.  Furthermore, Defendants' characterization of the substitute drink as being the same as RED BULL® is a misrepresentation of the nature, characteristics and qualities of the RED BULL® energy drink.

61. By reason of Defendants' unlawful actions, Plaintiffs have suffered and continue to suffer irreparable harm including, but not limited to, detriment and diminution in value of the RED BULL® mark, for which there is no adequate remedy at law.  Accordingly, Plaintiffs are entitled to an injunction against Defendant, pursuant to 15 U.S.C. § 1116.

62. Plaintiffs have also suffered and continue to suffer injury and are entitled to recover all damages sustained as a result of Defendants' actions, all profits realized by Defendants and costs of suit pursuant to 15 U.S.C. § 1117.

63. Defendants knew of Plaintiffs' long-standing and widely recognized RED BULL® mark and deliberately used the mark. Further, on multiple occasions, Red Bull NA asked Defendants to cease passing off non-RED BULL® beverages as RED BULL®, but Defendants deliberately ignored these requests and continued their unlawful behavior. Because Defendants' actions are and were willful, deliberate and fraudulent, Plaintiffs are entitled to treble damages and an award of reasonable attorneys' fees against Defendants, pursuant to 15 U.S.C. § 1117.

## COUNT II

### Trademark Infringement in Violation of Section 32(1)
### of the Lanham Act, 15 U.S.C. § 1114(1)

64. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 of the Complaint.

65. Defendants' use of the RED BULL® mark, by deliberately substituting, without comment, another beverage for the RED BULL® energy drink even though RED BULL® is specifically ordered, constitutes trademark infringement of Plaintiff Red Bull GmbH's U.S. Trademark Registration Number 3,092,197, in violation of the Lanham Act, 15 U.S.C. § 1114(1).

66. Defendants' unauthorized use of the RED BULL® mark in connection with non-RED BULL® beverages has created and continues to create a likelihood of confusion, mistake or deception as to the affiliation, connection, association, origin, sponsorship, approval, commercial activities, nature, characteristics and qualities of the beverages Defendants serve relative to Plaintiffs' RED BULL® energy drink.

67. By reason of Defendants' unlawful actions, Plaintiffs have suffered and continue to suffer irreparable harm including, but not limited to, detriment and diminution in value of the RED BULL® mark, for which there is no adequate remedy at law. Accordingly, Plaintiffs are entitled to an injunction against Defendants, pursuant to 15 U.S.C. § 1116.

68. Plaintiffs have suffered and continue to suffer injury and are entitled to recover all damages sustained as a result of Defendants' actions, all profits realized by Defendants and costs of suit, pursuant to 15 U.S.C. § 1117.

69. Defendants knew of Plaintiffs' long-standing and widely recognized RED BULL® mark and deliberately used this mark. Moreover, Defendants purposefully chose to substitute non-RED BULL® beverages for RED BULL® and failed to notify customers of this substitution even though these customers specifically asked for RED BULL®. Despite Plaintiffs' multiple demands to cease the infringing activity, Defendants, in pursuit of their unlawful activities and to confuse the trade and public, have intentionally and unlawfully continued to pass off non-RED BULL® beverages as RED BULL®. Defendants' actions are and were willful, deliberate and fraudulent, and thus Plaintiffs are entitled to treble damages and an award of reasonable attorneys' fees against Defendant, pursuant to 15 U.S.C. § 1117.

### COUNT III

### Unjust Enrichment in Violation of New York Common Law

70. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 of the Complaint.

71. Defendants have received and continue to receive substantial profits and other benefits from their passing off and sales of non-RED BULL® beverages as RED BULL®. Those profits and benefits rightfully belong to, and should have been received by, Plaintiffs.

HARRIS BEACH ⸱
ATTORNEYS AT LAW

17

72. By reason of Defendants' infringing actions, they have been unjustly enriched at Plaintiffs' expense in an amount to be proved at trial.

73. Defendants owe Plaintiffs all profits and benefits that have been received by Defendants from the passing off and sale of non-RED BULL® beverages as RED BULL®.

**COUNT VI**
**Unfair Competition Under**
**New York Common Law**

74. Plaintiffs reallege and incorporate by reference the allegations contained in Paragraphs 1 through 56 of the Complaint.

75. Defendants' use of the RED BULL® mark, by substituting another beverage for the RED BULL® energy drink, without notifying the customers of this substitution despite their specific request for RED BULL®, deceives the public and constitutes an act of unfair competition under New York common law.

76. By reason of Defendants' unlawful actions, Plaintiffs have suffered and continue to suffer irreparable harm including, but not limited to, detriment and diminution in value of the RED BULL® mark, for which there is no adequate remedy at law. Accordingly, Plaintiffs are entitled to an injunction against Defendants.

77. Plaintiffs have also suffered and continue to suffer injury and are entitled to recover all damages sustained as a result of Defendants' unlawful actions.

**WHEREFORE,** Plaintiffs Red Bull NA and Red Bull GmbH demand judgment against Defendants as follows:

(a)     On Counts I, II, and IV, a Preliminary Injunction Order that:

(i)      preliminarily enjoins and restrains Defendants, their agents, employees, attorneys, successors, licensees and assigns, and all others in active concert or participation with any

of them from selling or offering to sell, in response to orders for RED BULL®, a beverage of another manufacturer, without first giving the customer verbal notice that a beverage other than RED BULL® is being sold and the opportunity to accept or reject the substitute product prior to fulfilling the customer's order; from directly or indirectly marketing, advertising or using in any way the RED BULL® mark or any colorable imitation thereof in connection with a non-RED BULL® beverage; from doing any other acts likely to infringe Plaintiff Red Bull GmbH's RED BULL® mark; or from committing any other acts of unfair competition against Plaintiffs;

   (ii) orders Defendants to instruct their employees not to sell or offer to sell, in response to orders for RED BULL®, a beverage of another manufacturer, without first giving the customer verbal notice that a beverage other than RED BULL® is being sold and the opportunity to accept or reject the substitute product prior to fulfilling the customer's order;

   (iii) directs Defendants to show such Order to all their employees;

   (iv) directs Defendants to file with this Court and serve upon Plaintiffs within fourteen (14) days after entry of such Order, a report in writing, under oath, setting forth in detail the manner of Defendants' compliance; and

  (b) On Counts I, II, and IV, a Permanent Injunction Order that:

   (i) permanently enjoins and restrains Defendants, their agents, employees, attorneys, successors, licensees and assigns, and all others in active concert or participation with any of them from selling or offering to sell, in response to orders for RED BULL®, a beverage of another manufacturer, without first giving the customer verbal notice that a beverage other than RED BULL® is being sold and the opportunity to accept or reject the substitute product prior to fulfilling the customer's order; from directly or indirectly marketing, advertising or using in any way the RED BULL® mark or any colorable imitation thereof in connection with a non-RED BULL® beverage;

from doing any other acts likely to infringe Plaintiff Red Bull GmbH's RED BULL® mark; or from committing any other acts of unfair competition against Plaintiffs;

(ii)    orders Defendants to instruct their employees not to sell or offer to sell, in response to orders for RED BULL®, a beverage of another manufacturer, without first giving the customer verbal notice that a beverage other than RED BULL® is being sold and the opportunity to accept or reject the substitute product prior to fulfilling the customer's order;

(iii)    directs Defendants to show such Order to all their employees;

(iv)    directs Defendants to file with this Court and serve upon Plaintiffs within fourteen (14) days after entry of such Order, a report in writing, under oath, setting forth in detail the manner of Defendants' compliance; and

(c)    On Counts I-II, monetary damages sustained by Plaintiffs as a result of Defendants' unlawful conduct and all profits realized or lost, in an amount to be determined by the trier of fact, and to be trebled or enhanced because of Defendants' willful and deliberate activities described herein; and

(d)    On Count III, restitution in an amount according to proof; and

(e)    On Count IV, monetary damages sustained by Plaintiffs as a result of Defendants' unlawful conduct and all profits realized or lost, in an amount to be determined by the trier of fact, together with punitive and exemplary damages because of Defendants' willful and deliberate activities described herein; and

(f)    On Counts I-IV, costs of suit; and

(g)    On Counts I-II, reasonable attorneys' fees; and

(h)    For any other relief as is just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.


DATED:  February 23, 2007

HARRIS BEACH PLLC

By:   _Michael J. Masino_
Michael J. Masino
Attorneys for Plaintiffs
99 Garnsey Road
Pittsford, NY  14534
Telephone:   (585) 419-8624
Facsimile:    (585) 419-8813
mmasino@harrisbeach.com

And

Michael E. Pappas
California State Bar No. 130400
SONNENSCHEIN NATH & ROSENTHAL LLP
601 South Figueroa Street, Suite 1500
Los Angeles, California 90017
Telephone: (213) 892-5010
Facsimile: (213) 623-9924
mpappas@sonnenschein.com

Karen C. Marchiano
California State Bar No. 233493
Not Admitted in Massachusetts
SONNENSCHEIN NATH & ROSENTHAL LLP
One International Place, 3rd Floor
Boston, MA 02110
Telephone: (617) 235-6807
Facsimile: (617) 235-6899
kmarchiano@sonnenschein.com